LODGED

DAVID A. HUBBERT
Deputy Assistant Attorney General
Tax Division, United States Department of Justice
CHRISTOPHER S. STRAUSS
Trial Attorney (LA Bar No. 28770)
ELLEN M. QUATTRUCCI
Trial Attorney (DC Bar No. 462103)
DENNIS R. KIHM
Trial Attorney (TX Bar No. 24066929)
Tax Division, Western Criminal Enforcement Section
United States Department of Justice
    601 D St. NW, Room 7022
    Washington, D.C. 20004
    Telephone: (202) 514-5762
    Facsimile: (202) 514-9623
    E-mail:   Christopher.S.Strauss@usdoj.gov
              Ellen.M.Quattrucci@usdoj.gov
STEPHANIE YONEKURA
Acting United States Attorney
SANDRA R. BROWN
Assistant United States Attorney
Chief, Tax Division
    300 North Los Angeles Street
    Los Angeles, California 90012
    Telephone: (213) 894-5810
    Facsimile: (213) 894-0115
    E-mail: Sandra.Brown@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

2014 DEC 22  PM 12: 40
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF
LOS ANGELES
BY:_____

FILED
CLERK, U.S. DISTRICT COURT
DEC 2 3 2014
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

BANK LEUMI LE-ISRAEL B.M.,
THE BANK LEUMI LE-ISRAEL TRUST
COMPANY LTD.,
BANK LEUMI (LUXEMBOURG) S.A.,
LEUMI PRIVATE BANK S.A., and
BANK LEUMI USA,

                    Defendants.

No. CR 14-0731

DEFERRED PROSECUTION AGREEMENT

The United States Department of Justice, Tax Division, Criminal Enforcement, by and through David A. Hubbert, Deputy Assistant Attorney General, Tax Division, U.S. Department of Justice; Christopher S. Strauss and Ellen M. Quattrucci, Trial Attorneys, Tax Division, United States Department of Justice; and the United States Attorney's Office for the Central District of California, by and through Stephanie Yonekura, Acting United States Attorney and Sandra R. Brown, Assistant United States Attorney (collectively, the "Government") and the defendants Bank Leumi le-Israel B.M. ("Bank Leumi-Israel"); The Bank Leumi-le Israel Trust Company Ltd. (the "Bank Leumi Trust"); Bank Leumi (Luxembourg) S.A. ("Bank Leumi-Luxembourg"); Leumi Private Bank S.A., also referred to herein as "Bank Leumi-Switzerland"; and Bank Leumi USA (collectively, the "Bank Leumi Group Entities"), by the Deputy Chief Executive Officer of Bank Leumi-Israel and undersigned attorneys pursuant to the authority granted by the Bank Leumi Group Entities' Boards of Directors in the form of a Board Resolution, as described in paragraph 47, attached hereto as Exhibit A, hereby enter into this Deferred Prosecution Agreement (the "Agreement"). This Agreement does not apply to any individual or entity other than the Bank Leumi Group Entities as set forth herein.

### THE CRIMINAL INFORMATION

1.    The Bank Leumi Group Entities will waive indictment and consent to the filing of a one-count Information (the "Information") in the United States District Court for the Central District of California, Western Division (the "Court") charging the Bank Leumi Group Entities with unlawfully,

voluntarily, intentionally, and knowingly agreeing together and with others both known and unknown to the United States Attorney to commit the following offense against the United States:  to willfully aid and assist in the preparation and presentation of false income tax returns and other documents to the Internal Revenue Service of the Treasury Department, in violation of Title 26, United States Code, Section 7206(2), all in violation of 18 U.S.C. § 371.  A copy of the Information is attached hereto as Exhibit B.

## ACCEPTANCE OF RESPONSIBILITY FOR VIOLATION OF LAW

2.   The Bank Leumi Group Entities acknowledge and accept that, among other things, as set forth more fully in the Statement of Facts, attached hereto as Exhibit C:

> The Bank Leumi Group Entities aided and assisted U.S. taxpayers to file false tax returns by aiding and assisting such U.S. clients to maintain undeclared accounts and evade their U.S. tax obligations through a variety of means. Prior to April 2009, Bank Leumi-Israel, Bank Leumi-Switzerland, and Bank Leumi-Luxembourg (collectively the "Foreign Leumi Group Entities") sent private bankers to the United States on a regular basis for the purpose of opening new accounts and servicing existing accounts of U.S. taxpayers, some of whom the bankers knew were evading their U.S. tax obligations. The Foreign Leumi Group Entities, knowing that certain U.S. taxpayers were maintaining undeclared accounts, offered an array of services and products that aided and assisted the U.S. taxpayers in opening and maintaining undisclosed accounts.  These products and services included: (1) the issuance of guarantees and Standby Letters of Credit to collateralize loans issued by Bank Leumi, USA; (2) the use of offshore entities and the Bank Leumi Trust to

serve as nominee accountholders; (3) the use of
"Hold Mail" service that prevented any mail from
the Foreign Leumi Group Entities from coming to
the U.S. client in the United States; (4) the use
of "assumed name" and "numbered" accounts that
concealed the name of the U.S. account holder on
all external correspondence, account records, and
other documents; and (5) the opening and
maintenance of accounts for U.S. clients that
exited UBS and other Swiss banks after the
Department of Justice's investigation of UBS
became public.

Specifically:

(A)   Beginning in 2000 and continuing until 2010,
      the Foreign Leumi Group Entities, through
      certain private bankers and managers within
      their respective Private Banking Divisions,
      actively assisted or otherwise facilitated a
      number of U.S. taxpayers in maintaining
      undeclared accounts at one or more of the
      Foreign Leumi Group Entities' branches by
      (1) advising certain clients to sell all
      U.S. securities to evade U.S. reporting
      requirements on earnings; and (2) referring
      U.S. beneficial owners of accounts to
      outside advisors to set up offshore
      corporations to act as nominee account
      holders, thereby concealing the U.S.
      taxpayers' beneficial ownership in the
      accounts.

(B)   In July 2008, UBS, the largest Swiss bank,
      announced that it was closing its U.S.
      cross-border business.  Certain Bank Leumi
      executives in both Israel and Switzerland
      viewed UBS's exit from the U.S. cross-border
      business as an opportunity and sought to
      obtain former UBS customers whose accounts
      UBS had stopped servicing because the
      accounts were undeclared and were used to
      evade U.S. tax obligations.

(C)   The Bank Leumi Group Entities marketed and
      offered two types of loans to U.S. customers

4

through Bank Leumi USA: participation loans
and loans guaranteed by a Standby Letter of
Credit ("SBLC").  These types of loans allowed
U.S. taxpayers to enjoy the economic benefits
of undeclared funds held offshore without
directly repatriating the funds or creating a
paper trail that could disclose the existence
of the undisclosed foreign accounts to U.S.
authorities.

3.    The Bank Leumi Group Entities admit, accept, and
acknowledge that they are responsible for the acts and omissions
of their officers, executives, employees, and agents, as set
forth in the Statement of Facts and herein.

4.    The Bank Leumi Group Entities represent to the
Government that this Agreement, the Information, the Statement
of Facts, and all other exhibits to this Agreement were reviewed
by their respective Boards of Directors and any officer,
employee or agent deemed necessary by the Bank Leumi Group
Entities in order to enter this Agreement.  The Bank Leumi Group
Entities, through their undersigned authorized representatives
represent that the Statement of Facts contains truthful and
accurate statements based upon the Bank Leumi Group Entities'
internal investigation, and information provided to the Bank
Leumi Group Entities by the Government.

5.    The U.S. accounts as set forth more fully in
paragraph 2 of this Agreement and the Statement of Facts,
concerning the period between 2002 and 2010, are referred to
hereinafter as the "Relevant Accounts."

6.    Pursuant to this Agreement, based upon the conduct set
forth in the Statement of Facts, the Bank Leumi Group Entities

agree to pay to the United States a total of Two Hundred Seventy Million Dollars ($270,000,000)("the Resolution Amount") within 5 business days of the approval of this Agreement by the United States District Court.  The Bank Leumi Group Entities agree that they shall pay $71,769,305 in restitution regarding unpaid taxes on interest, dividends, and capital gains of U.S. clients with respect to the Relevant Accounts, which the parties agree exceeds the gross profits related to the Relevant Accounts at Bank Leumi-Israel, Bank Leumi-Luxembourg, and Bank Leumi USA. The parties agree that the restitution amount shall be paid directly to the Internal Revenue Service, IRS-RACS, Attn: Mail Stop 6261/Restitution, 333 W. Pershing Ave., Kansas City, MO 64108 pursuant to payment instructions provided to the Bank Leumi Group Entities.  The Bank Leumi Group Entities further agree to pay $198,230,695, which consists of (1) $157,000,000 for Bank Leumi-Switzerland, in lieu of restitution for all Relevant Accounts at Bank Leumi-Switzerland, consistent with the Program for Non-Prosecution Agreements or Non-Target Letters for Swiss Banks announced on August 29, 2013, and (2) in light of the Bank Leumi Group Entities' extraordinary cooperation as stated in paragraphs 16 through 29, a monetary penalty of $41,230,695 for Bank Leumi-Israel, Bank Leumi-Luxembourg, and Bank Leumi USA (collectively, the "Penalty Amount").  The parties agree that the amount paid with respect to Bank Leumi-Switzerland exceeds the gross profits of Bank Leumi Switzerland related to the Relevant Accounts. The Penalty Amount shall be paid directly to the United States pursuant to payment instructions provided to the Bank Leumi Group Entities.  The

parties agree that if the Bank Leumi Group Entities fulfill their obligations set forth in this Agreement, the Government will take no further action to collect any additional criminal payment from the Bank Leumi Group Entities with respect to the criminal investigation and the matters referenced in the Statement of Facts and related to the Relevant Accounts.

7.    The Bank Leumi Group Entities agree that no portion of the amounts that the Bank Leumi Group Entities agree to pay to the Government and/or the Internal Revenue Service pursuant to the terms of this Agreement is deductible on any United States federal, state, or local tax return.  The Bank Leumi Group Entities further agree not to challenge or dispute any part of the Resolution Amount in any subsequent judicial or administrative proceeding against the United States or any agency thereof.

8.    The Bank Leumi Group Entities acknowledge that the payment of the Resolution Amount is a final payment and shall not be refunded: (a) if the Government moves to dismiss the Information pursuant to this Agreement; or (b) should the Government later determine that any of the Bank Leumi Group Entities has breached this Agreement and brings a prosecution against any of the Bank Leumi Group Entities.  Further, nothing in this Agreement shall be deemed an agreement by the United States that the Penalty Amount is the maximum amount that may be required in the event of any such prosecution and the Government shall not be precluded in any such prosecution from arguing that the Court should impose a higher amount.  The Government agrees, however, that in the event of a breach of this Agreement and a

subsequent prosecution against any of the Bank Leumi Group Entities, it will recommend to the Court that the Penalty Amount paid by the Bank Leumi Group Entities pursuant to this Agreement be credited toward any payment ordered by the Court as part of any judgment.

## PERMANENT RESTRICTIONS ON THE U.S. CROSS-BORDER BUSINESS OF
## BANK LEUMI LUXEMBOURG AND LEUMI PRIVATE BANK

9.  The "Bank Leumi Group" is defined herein as the Bank Leumi Group Entities plus all other Bank Leumi-Israel subsidiaries and affiliates of Bank Leumi-Israel worldwide.

10.  The Government recognizes that Bank Leumi-Israel, as the parent organization of the Bank Leumi Group, informed the Government prior to the execution of this Agreement that it had decided on its own initiative to cease all banking and investment services to U.S. taxpayers through Bank Leumi-Luxembourg (hereinafter "BLUX") and Leumi Private Bank (hereinafter "LPB").  BLUX and LPB agree that (a) BLUX and LPB shall cease to provide banking and investment services for all active accounts held or beneficially owned by a U.S. taxpayer by December 31, 2014; and (b) BLUX and LPB shall cease to provide banking and investment services for all accounts, both active and dormant, held or beneficially owned by a U.S. taxpayer by the end of the Deferral Period, as defined in paragraph 31 of this Agreement.  The cessation of banking and investment services with respect to U.S. clients described in this paragraph is hereinafter referred to as the "BLUX/LPB Exit Program." The completion of the BLUX/LPB Exit Program as set

forth in this paragraph is a material condition of this Agreement.

11.   Pursuant to this Agreement, the Bank Leumi Group Entities agree that the Bank Leumi-Israel Deputy Chief Executive Officer or an executive appointed by Bank Leumi-Israel's Board of Directors shall provide to the United States Department of Justice periodic reports on the BLUX/LPB Exit Program.  The first report shall be due on or before the two-month anniversary of the date this Agreement is approved by the Court in the Central District of California (the "Approval Date"), and every sixty (60) days thereafter until the completion of the BLUX/LPB Exit Program.

## HEIGHTENED STANDARDS FOR FATCA COMPLIANCE

12.   Bank Leumi-Israel, as the parent organization of the Bank Leumi Group, agrees to ensure that (a) all its subsidiaries and affiliates, other than Bank Leumi USA, to the extent required by the Foreign Account Tax Compliance Act, 26 U.S.C. §§ 1471-1474 ("FATCA"), have or will enter into a foreign financial institution agreement ("FFI") or will register under an applicable intergovernmental agreement ("IGA") for the implementation of FATCA; and (b) all its subsidiaries and affiliates will continue to implement and maintain an effective program of internal controls with respect to compliance with FATCA in its affiliates and subsidiaries (the "FATCA Compliance Program").  Bank Leumi-Israel shall ensure that the FATCA Compliance Program include, but not necessarily be limited to, the following measures, a number of which Bank Leumi-Israel has represented to the Government have already been implemented:

a.    The appointment of a Global Head of Cross-Border Activity who reports directly to the Chief Risk Officer or Deputy Chief Executive Officer of Bank Leumi-Israel, and who shall make periodic reports on FATCA to the Audit Committee of the Bank Leumi-Israel Board of Directors;

b.    The continued employment of a designated FATCA Coordinator at Bank Leumi-Israel who reports to Bank Leumi-Israel's Chief Compliance Officer;

c.    The appointment of a FATCA Compliance Officer at each other affiliate and subsidiary who shall be responsible for compliance with FATCA and shall report to each subsidiary's or affiliate's Chief Compliance Officer, who shall in turn report directly to the Risk Management Committee of the Boards of Directors of each affiliate or subsidiary. Each Board of Directors shall in turn report its FATCA compliance to Bank Leumi-Israel's Board of Directors;

d.    The continued development and implementation of enhanced controls to identify, prevent, detect, and correct any material failures regarding the Bank Leumi Group's compliance with FATCA;

e.    The continued development and implementation of periodic training of relevant personnel with respect to FATCA compliance; and

f.    The continued development and implementation of policies and procedures for receiving and investigating allegations of material failures of FATCA-related internal controls.

13.  In addition to the FATCA Compliance Program, Bank Leumi-Israel shall implement a revised governance structure for the compliance functions.  Within this new framework, the Chief Risk Officer will have functional management responsibility and joint line management authority over the compliance functions that advise the different business divisions, including Global Private Banking.  The Chief Risk Officer will also have authority to identify issues of Bank Leumi Group importance, and will have final authority with respect to compensation and promotion matters for divisional level compliance personnel.

14.  The Bank Leumi Group Entities agree to close any and all accounts of recalcitrant account holders as defined in 26 U.S.C. § 1471(d)(6).  The development and implementation of the FATCA-related measures described in paragraphs 12 and 13 of this Agreement shall include procedures to prevent any of Bank Leumi Group's employees from assisting recalcitrant account holders to engage in acts of further concealment of assets and income in connection with closing any account or transferring any funds; and Bank Leumi-Israel shall ensure that the Bank Leumi Group will not open any U.S. accounts except on conditions that ensure that the account will be declared to the United States and will be subject to disclosure to the United States by the Bank Leumi Group.

15.  With respect to Bank Leumi USA, Bank Leumi USA agrees to provide the Department of Justice periodic reports that identify any loan issued by Bank Leumi USA that is collateralized by a SBLC issued by any Foreign Leumi Group Entity, or any foreign affiliate of the Bank Leumi Group.  The

periodic reports shall further warrant that Bank Leumi USA is
fully compliant with all applicable anti-money laundering
regulations regarding such loans and that the relevant foreign
affiliate has confirmed that the related foreign account is
FATCA compliant.  The periodic reports shall be due on the two-
month anniversary of the Approval Date, and every one hundred
eighty (180) days thereafter until the end of the Deferral
Period.

## COOPERATION

16.   The Government acknowledges that the Bank Leumi Group
Entities have provided substantial and extraordinary cooperation
concerning the Government's investigation of the Bank Leumi
Group Entities' cross-border business with U.S. taxpayers.
Among other things, beginning in December 2011, Bank Leumi-
Israel undertook substantial efforts through meetings with the
Bank of Israel, the Israeli Ministry of Finance, and the Israeli
Tax Authority ("ITA") to facilitate the provision of U.S.
account files and client data, including the identities of U.S.
beneficial owners, of U.S. accounts held at Bank Leumi-Israel
that had certain attributes, without requiring the Government to
identify each U.S. account holder or beneficial owner by name
(hereinafter referred to as "Pattern Requests").  Bank Leumi
met with the ITA Director General to request that he confer with
IRS representatives concerning the exchange of information
pursuant to the Convention Between the Government of the United
States of America and the Government of the State of Israel With
Respect to Taxes on Income (hereinafter the "Tax Treaty").

17.   In August 2013, Bank Leumi-Israel informed the Israel Association of Banks that it supported efforts to amend Israeli law to facilitate the exchange of information with the United States and would not join in a divergent view.

18.   The Bank Leumi Group Entities conducted an extensive internal investigation of the Bank Leumi Group Entities' conduct, including the collection and review of millions of documents.  During the Government's investigation, Bank Leumi-Israel timely provided over 481,000 pages of documents to the Government, some of which were voluntarily provided and in addition to the information sought by the Government pursuant to its requests under the Tax Treaty or other formal process.  Bank Leumi-Israel voluntarily provided translations of produced documents, conducted over 40 internal interviews, and through counsel, proffered the substance of internal interviews conducted by counsel with the Bank Leumi Group Entities' employees and management upon the Government's request. Additionally, Bank Leumi-Israel made presentations to the Government regarding the results of its internal investigation.

19.   The Bank Leumi Group Entities confirm that relevant senior officers and managers of the Bank Leumi Group Entities that were in place at the time the conduct set forth in the Statement of Facts occurred have been replaced.

20.   The Government acknowledges that in connection with the Bank Leumi Group Entities' internal investigation, Bank Leumi-Israel engaged Deloitte Transactions and Business Analytics LLP ("Deloitte") as an independent forensic and accounting expert to collect and analyze data regarding U.S.

13

accounts.  Deloitte collected and analyzed electronic and hard copy documents from four countries.  Deloitte made an in-person presentation to the Government supporting its data collection and analysis of U.S. accounts and cooperated in providing the production of additional explanatory materials as requested by the Government.

21.  Bank Leumi-Israel cooperated with U.S. investigators by voluntarily and timely providing information that assisted the Government in connection with requests under the Tax Treaty and the Mutual Legal Assistance Treaty request to the Duchy of Luxembourg, in a manner that resulted in the production of additional information relevant to the Government's investigation.

22.  The Government acknowledges that Bank Leumi-Israel has engaged special counsel to assist in requesting the Israeli Government to look favorably upon IRS requests for information and has requested that the Israeli Government agree to future IRS requests for information regarding U.S. accounts.  The Government has been advised that Bank Leumi-Israel has recently approached the Israeli Government to amend Israeli Tax and Anti-Money-Laundering laws to require Israeli banks to consider the tax compliance of its customers.

23.  The Government acknowledges that in 2012, Bank Leumi-Israel sent letters to its U.S. clients advising them of the IRS's Offshore Voluntary Disclosure Program.

24.  The Government acknowledges that the Foreign Leumi Group Entities have provided data regarding outgoing transfers during the period between June 1, 2008, and December 31, 2012,

which includes the value of the transfers, the number of accounts engaging in transfers, and the financial institutions to which such transfers were made.

25. The Government acknowledges that, prior to being contacted by the Government concerning this investigation, Bank Leumi USA began a process of conducting its own assessment of SBLC loans by reviewing all customer relationships with outstanding SBLC loan clients. Bank Leumi USA continued that process by either confirming that the SBLC-backed loans were U.S. tax-compliant or calling the loans and, where necessary, terminating non-compliant customer relationships.

26. The Bank Leumi Group Entities acknowledge and understand that the cooperation they have provided to date with the criminal investigation by the Government, and its pledge of continuing cooperation, are important and material factors underlying the Government's decision to enter into this Agreement. The Bank Leumi Group Entities agree to cooperate fully with the Department of Justice, the Internal Revenue Service, and any designated law enforcement agency regarding any matter related to the Government's criminal investigation of the Bank Leumi Group Entities' U.S. cross-border business, including in connection with any criminal investigation or prosecution based on information disclosed to the Government pursuant to this Agreement.

27. The Bank Leumi Group Entities agree that their continuing cooperation with the Government's investigation as set forth in the preceding paragraphs shall encompass, but not be limited to, the following:

a.   Completely and truthfully disclosing all information in their possession to the Government about which the Government may inquire in connection with its investigation of the Bank Leumi Group Entities' U.S. cross-border business;

b.   Assembling, organizing, and providing, in a responsive and prompt fashion, and upon request, expedited fashion, all documents, records, information, and other evidence in the Bank Leumi Group's possession, custody, or control as may be requested by the Government related to its United States cross-border business;

c.   Providing, at their own expense, fair and accurate translations of any foreign language documents produced by the Bank Leumi Group pursuant this Agreement as may be requested by the Government, and;

d.   Providing testimony or information, including testimony and information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or other proceeding as requested by the Government. Such cooperation shall include providing information and testimony concerning the Government's investigation, including, but not limited to, the conduct set forth in the Information and/or the Statement of Facts.

28.   Nothing in this Agreement shall require a Bank Leumi Group Entity to waive any of the protections of the attorney-client privilege, attorney work-product doctrine, or any other applicable privilege unless the Bank Leumi Group Entity voluntarily chooses to waive any such privilege.

16

29.   The Bank Leumi Group Entities agree that their obligations to cooperate under the terms set forth in this Agreement will continue even after the dismissal of the Information, and the Bank Leumi Group Entities will continue to fulfill the cooperation obligations set forth in this Agreement in connection with any investigation, criminal prosecution, or civil proceeding brought by the Government arising out of the conduct set forth in the Information or the Statement of Facts relating in any way to the Government's investigation of the Bank Leumi Group Entities' U.S. cross-border business.

## DISCLOSURE OF CLIENT DATA

30.   Pursuant to requests made under the Tax Treaty for information regarding accounts held and/or beneficially owned by U.S. clients, and consistent with orders issued by the Israeli courts regarding such requests, (1) Bank Leumi-Israel has provided or caused to be provided to the Internal Revenue Service certain account information, including the identities of U.S. account holders and beneficial owners, with respect to in excess of 1,500 accounts held at Bank Leumi-Israel and Bank Leumi Trust (the "Disclosed Accounts"); and (2) Bank Leumi-Israel agrees that it shall collect and maintain all account records regarding the Disclosed Accounts and produce all account records regarding the Disclosed Accounts as may be requested by the Internal Revenue Service on an expedited basis.   The parties agree that the production of information and records pursuant to this paragraph is a material condition of this Agreement.

17

## DEFERRAL OF PROSECUTION

31.    In consideration of the Bank Leumi Group Entities' entry into this Agreement and their commitment to: (a) accept and acknowledge responsibility for their conduct; (b) continue to cooperate with the Government as set forth above; (c) make payments specified in this Agreement; (d) comply with United States federal criminal laws and any guidance, directive, regulation or order issued by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the United States Department of the Treasury with respect to FATCA; and (e) otherwise comply with all of the terms of this Agreement, the Government agrees to recommend to the Court that prosecution of any of the Bank Leumi Group Entities be deferred for the period of twenty-four (24) months from the Approval Date (the "Deferral Period"), subject to the provisions of paragraph 39 below.  The Bank Leumi Group Entities shall expressly waive indictment, and hereby waive all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Central District of California for the period during which this Agreement is in effect.

32.    The Bank Leumi Group Entities also hereby agree to waive all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without

limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a.

33. The Government agrees that if the Bank Leumi Group Entities are in compliance with all of their obligations under this Agreement, the Government shall: (a) within thirty (30) days of the expiration of Deferral Period (including any extension thereof) hereunder, seek dismissal with prejudice as to the Bank Leumi Group Entities of the Information filed against them pursuant to paragraphs 1 and 31 above; and (b) during the term of this Agreement and thereafter, refrain from pursuing any additional charges against, or investigation of, the Bank Leumi Group Entities arising out of, in connection with, or otherwise relating to the conduct of the Bank Leumi Group Entities' U.S. cross-border business as admitted to or disclosed by the Bank Leumi Group Entities to the Government.

34. By entering into this Agreement, the United States does not compromise any civil liability, including but not limited to any tax liability, which the Bank Leumi Group may have incurred or may incur as a result of its conduct set forth in the Statement of Facts.

35. This Agreement does not provide any protection against prosecution for any crimes except as set forth above in paragraph 33(b). The Bank Leumi Group Entities and the Government understand that this Agreement to defer prosecution must be approved by the District Court in the Central District of California, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to approve the Agreement to defer

19

prosecution for any reason, both the Government and the Bank Leumi Group Entities are released from any obligation imposed upon them by this Agreement, and any exhibits hereto, which shall be null and void.

36.   It is further understood that should the Government in its sole discretion determine, after the date of the execution of this Agreement, that any of the Bank Leumi Group Entities: (a) gives false, incomplete, or misleading information; (b) violates any United States federal criminal law or fails to comply with any guidance, directive, regulation, or order issued by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, or the United States Department of the Treasury with respect to FATCA; or (c) otherwise commits a material violation of this Agreement, the Bank Leumi Group Entities shall, in the Government's sole discretion, thereafter be subject to prosecution for any federal criminal violations of which the Government has knowledge, including but not limited to a prosecution based on the conduct described in the Information and the Statement of Facts; any prosecution may be premised on any information provided by or on behalf of the Bank Leumi Group Entities at any time.

37.   Any prosecutions that are not time-barred by the applicable statute of limitations on the date of the execution of this Agreement may be commenced against any of the Bank Leumi Group Entities within the applicable period governing the statute of limitations.   In addition, the Bank Leumi Group Entities agree to toll, and exclude from any calculation of time, the running of the statute of limitations during the

duration of this Agreement.  By this Agreement, the Bank Leumi Group Entities expressly intend to and hereby do waive their rights in the foregoing respects, including any right to make claims premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay.  These waivers are knowing, voluntary, and in express reliance of the advice of the Bank Leumi Group Entities' counsel.

38.  It is further agreed that in the event the Government, in its sole discretion, determines that any of the Bank Leumi Group Entities has committed a material violation of this Agreement, including the Bank Leumi Group Entities' failure to meet their obligations under this Agreement: (a) all statements set forth in the Statement of Facts, as well as any testimony given by the Bank Leumi Group Entities or by any of its then-current employees before a grand jury, or otherwise, whether before or after the date of this Agreement, or any leads from statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Government against any of the Bank Leumi Group Entities; and (b) none of the Bank Leumi Group Entities shall assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of the Bank Leumi Group Entities before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence.  By executing

1  this Agreement, it is the intent of the Bank Leumi Group

2  Entities to waive any and all rights in the foregoing respects.

3      39.    The Bank Leumi Group Entities agree that, in the

4  event that the Government determines, in its sole discretion,

5  during the Deferral Period described in paragraph 31 above (or

6  any extension thereof) that any of the Bank Leumi Group Entities

7  have committed a material violation of this Agreement, a one-

8  year extension of the period of deferral of prosecution may be

9  imposed in the sole discretion of the Government, and, in the

10 event of continuing or additional violations, additional one-

11 year extensions as appropriate; provided, however, that in no

12 event shall the total term of the deferral of prosecution period

13 of this Agreement exceed four (4) years.

14     40.    The Bank Leumi Group Entities agree that they shall

15 not, through their attorneys, agents, or employees, make any

16 statement, in litigation or otherwise, contradicting any factual

17 statement in the Statement of Facts or the Bank Leumi Group

18 Entities' representations set forth in this Agreement; provided,

19 however, that the restrictions set forth in this paragraph are

20 not intended to and shall not apply to any current or former

21 employee of any of the Bank Leumi Group Entities, or any other

22 individual or entity, in the course of any criminal, regulatory,

23 or civil case, investigation, or other proceeding, whether in

24 the United States or any other jurisdiction, as long as the

25 individual or entity is not authorized to speak on behalf of any

26 of the Bank Leumi Group Entities in such proceedings.  Any

27 contradictory statement by any of the Bank Leumi Group Entities

28 shall constitute a breach of this Agreement and any of the Bank

Leumi Group Entities shall thereafter be subject to prosecution as specified in paragraphs 36 and 37 above, or the Deferral Period may be extended pursuant to paragraph 39 above.

41. The decision as to whether any contradictory statement will be imputed to any of the Bank Leumi Group Entities for the purpose of determining whether there was a breach of this Agreement shall be at the sole discretion of the Government. Upon the Government's reaching a determination that a contradictory statement was made by any of the Bank Leumi Group Entities, the Government shall promptly notify the Bank Leumi Group Entities in writing of the contradictory statement, and the Bank Leumi Group Entities may avoid a breach of this Agreement by repudiating the statement both to the recipient of the statement and to the Government within five (5) business days after receipt of notice from the Government. The Bank Leumi Group Entities consent to the public release by the Government, in its sole discretion, of any repudiation.

42. The Government agrees that nothing in this Agreement in any way prevents the Bank Leumi Group Entities from taking good faith positions in litigation involving private parties, including asserting defenses and affirmative defenses.

### THE GOVERNMENT'S DISCRETION

43. The Bank Leumi Group Entities agree that it is within the Government's sole discretion to choose, in the event of a violation of this Agreement, the remedies contained in paragraphs 36 and 37, or instead choose to extend the Deferral Period pursuant to paragraph 39. Should the Government determine that any of the Bank Leumi Group Entities have committed a

1  material violation of this Agreement, including paragraph 6, the
2  Government shall provide prompt written notice to Bank Leumi-
3  Israel addressed to its General Counsel, and to the Bank Leumi
4  Group Entities' counsel, Angela Burgess, Esq. of Davis Polk &
5  Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, or to
6  any successor the Bank Leumi Group Entities may designate, of
7  the alleged material violation and provide the Bank Leumi Group
8  Entities with a three-week period from the date of receipt of
9  notice in which to make a presentation to the Government,
10 including upon request by the Bank Leumi Group Entities, the
11 Assistant Attorney General in charge of the Tax Division of the
12 Department of Justice, to demonstrate that no material violation
13 has occurred, or, to the extent applicable, that the material
14 violation should not result in the exercise of those remedies or
15 in an extension of the Deferral Period.  The Bank Leumi Group
16 Entities expressly understand and agree that the exercise of
17 discretion by the Government under this Agreement is not subject
18 to review in any court or other tribunal outside of the United
19 States Department of Justice.

20                    **LIMITS ON THIS AGREEMENT**

21      44.  It is understood that this Agreement is binding on the
22 Bank Leumi Group Entities and the Government as defined above,
23 but specifically does not bind any other federal agencies, any
24 state or local law enforcement authorities, any licensing
25 authorities, or any regulatory authorities.  However, if
26 requested by the Bank Leumi Group Entities or its attorneys, the
27 Government will bring to the attention of any agencies or
28 authorities, this Agreement, the cooperation of the Bank Leumi

1  Group Entities, and its compliance with its obligations under

2  this Agreement, and any remedial steps specified in or

3  implemented pursuant to this Agreement.

4              **PUBLIC FILING AND MISCELLANEOUS PROVISIONS**

5       45.  The Bank Leumi Group Entities and the Government agree

6  that, upon filing of the Information in accordance with

7  paragraph 1 above, this Agreement, including the Statement of

8  Facts and the other exhibits, shall be filed publicly in the

9  proceedings in the United States District Court for the Central

10 District of California.

11      46.  This Agreement may be executed in counterparts, each

12 of which constitutes an original and all of which taken together

13 constitute one and the same document.

14      47.  The Bank Leumi Group Entities shall provide to the

15 Government a certified copy of a resolution of the Board of

16 Directors of Bank Leumi-Israel affirming that the Board of

17 Directors has authority to enter into this Agreement on behalf

18 of all of the Bank Leumi Group Entities and that each Bank Leumi

19 Group Entity Board of Directors has (1) reviewed the Information

20 and the Statement of Facts in this case; (2) reviewed this

21 Agreement; (3) consulted with legal counsel in connection with

22 this matter; (4) voted to enter into the proposed Agreement; and

23 (5) voted to authorize the Bank Leumi-Israel corporate officer

24 identified below to execute this Agreement on behalf of all of

25 the Bank Leumi Group Entities and all other documents necessary

26 to carry out the provisions of this Agreement.

27      48.  Deloitte shall provide the Government with a statement

28 summarizing the quality assurance processes that were executed

1  in producing the computations provided to the Government and
2  confirming that its work was performed in accordance with the
3  American Institute of Certified Public Accountants Standards for
4  Consulting Services.

5      49.  This Agreement sets forth all of the terms of the
6  Deferred Prosecution Agreement between the Bank Leumi Group
7  Entities and the Government.  No modifications or additions to
8  this Agreement, in whole or in part, shall be valid unless they

9  / / / / /
10 / / / / /
11 / / / / /
12 / / / / /
13 / / / / /
14 / / / / /
15 / / / / /
16 / / / / /

1  are set forth in writing and signed by the Government, the Bank

2  Leumi Group Entities' attorneys, and a duly authorized

3  representative of the Bank Leumi Group Entities.

4                        Respectfully submitted,

5

6  DAVID A. HUBBERT                STEPHANIE YONEKURA
   Deputy Assistant Attorney General  Acting United States Attorney

7  Tax Division

8

9  CHRISTOPHER S. STRAUSS          SANDRA R. BROWN

10 Trial Attorney                  Assistant United States
                                    Attorney

11                                 Chief, Tax Division

12 ELLEN M. QUATTRUCCI
   Trial Attorney

13

14                                 Date:  12/22/14

15

16 DENNIS R. KIHM
   Trial Attorney

17

18 Date:  12/22/14

19

20

21

22

23

24

25

26

27

28

1   are set forth in writing and signed by the Government, the Bank
2   Leumi Group Entities' attorneys, and a duly authorized
3   representative of the Bank Leumi Group Entities.

4

5   BANK LEUMI GROUP ENTITIES
6   Defendants

7
8   Date: 12/16/14      By: _____
9                           PROF. DANIEL TSIDDON
                            DEPUTY CHIEF EXECUTIVE OFFICER
                            BANK LEUMI LE-ISRAEL GROUP
10

11

12   DAVIS POLK & WARDWELL LLP
13
14   Date: 12/16/14      By: _____
15                           SCOTT W. MULLER, ESQ.
16                           ANGELA T. BURGESS, ESQ.
                            AVI GESSER, ESQ.
17                           Counsel to the Bank Leumi Group
                            Entities
18

19

20

21

22

23

24

25

26

27

28

27 A



EXHIBIT A TO DEFERRED PROSECUTION AGREEMENT

**RESOLUTION OF THE BOARD OF DIRECTORS OF BANK LEUMI LE-ISRAEL B.M**

At a duly held meeting held on December 8, 2014, the Board of Directors of Bank Leumi le-Israel B.M ("**Leumi**" or the "**Company**") resolved as follows:

WHEREAS, the Company, together with Bank Leumi le-Israel Trust Company Ltd., Bank Leumi (Luxembourg) S.A, Leumi Private Bank Ltd. and Bank Leumi USA (collectively, the "**Leumi Group Entities**") have been engaged in discussions with the United States Department of Justice, Tax Division, Western Criminal Enforcement Section and the United States Attorney's Office, Tax Division for the Central District of California (collectively, the "**Office**") regarding certain issues arising out of, in connection with, or otherwise relating to the conduct of the U.S. cross-border business by the Leumi Group Entities;

WHEREAS, in order to resolve such discussions, it is proposed that the Company together with other Leumi Group Entities enter into a certain deferred prosecution agreement with the Office (the "**Agreement**"); and

WHEREAS, the Company's outside Counsel has advised the Board of Directors of the Company's rights, possible defenses, and the consequences of entering into the Agreement;

This Board hereby RESOLVES that:

1.      The Company (i) consents to the filing in the United States District Court for the Central District of California, Western Division (the "**Court**") of an Information charging the Company (together with other Leumi Group Entities), with one count of agreeing among themselves and others to willfully aid and assist in the preparation and presentation of false income tax returns and other documents to the Internal Revenue Service, in violation of Title 26, United States Code, Section 7206 (2), all in violation of 18 U.S.C. § 371 as set forth more fully in the Information attached as Exhibit B to the Agreement and reviewed by this Board of Directors, and (ii) agrees to pay, together with other Leumi Group Entities, an amount no greater than $270 million in connection with the execution of the Agreement and to execute the ongoing obligations described therein in accordance with Israeli law;

2.      The Board of Directors of the Company has reviewed the Agreement including the Information attached as Exhibit B to the Agreement and the Statement of Facts (attached as Exhibit C to the Agreement), consulted with legal counsel in connection with this matter and voted to enter into the Agreement.

3.      The Deputy Chief Executive Officer of the Company is authorized on behalf of the Company to execute the Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such non- material changes as the Deputy Chief Executive Officer of the Company may approve;

4.      The Board takes note that the Deputy Chief Executive Officer of the Company, was also authorized by the Boards of Directors of other Leumi Group Entities to execute the Agreement on their behalf, after each board reviewed the Agreement including the Information attached as Exhibit B to the Agreement and the Statement of Facts (attached as Exhibit C to the Agreement), consulted with legal counsel in connection with this matter, voted to enter into the Agreement and to authorize the Deputy Chief Executive Officer of the Company, to execute the Agreement on behalf of the other Leumi Group Entities.

5.      The Board hereby authorizes, empowers and directs the Deputy Chief Executive Officer of the Company, or his delegate and Scott W. Muller, Esq. and Angela T. Burgess, Esq., of Davis Polk &Wardell LLP, to take, on behalf of the Company and other Leumi Group Entities, any and all actions as may be necessary or appropriate, and to approve and execute the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolutions; and





6.   All of the actions of the Deputy Chief Executive Officer of the Company, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company.

   **IN WITNESS WHEREOF, the Board of Directors of the Company has executed this Resolution**

Company Secretary

**Adv. Yael Rudnicki**
Group   Secretary

1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                 FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,          No. CR 14-

12                 Plaintiff,           I N F O R M A T I O N

13                 v.                   [18 U.S.C. § 371: Conspiracy]

14   BANK LEUMI LE-ISRAEL B.M.,
     THE BANK LEUMI LE-ISRAEL TRUST
15   COMPANY LTD.,
     BANK LEUMI (LUXEMBOURG) S.A.,
16   LEUMI PRIVATE BANK S.A., and
     BANK LEUMI USA,
17
                 Defendants.
18

19

20        The United States Attorney charges:

21                      INTRODUCTORY ALLEGATIONS

22        At all relevant times relevant to this Information:

23        1.   Defendant BANK LEUMI LE-ISRAEL, B.M. ("BANK LEUMI-

24   ISRAEL") was a public company, registered with the Registrar of

25   Companies in Israel and traded on the Tel-Aviv stock exchange.

26   Defendant BANK LEUMI-ISRAEL was the parent company of the Leumi

27   Group, which included defendant THE BANK LEUMI LE-ISRAEL TRUST

28   COMPANY LTD. ("BANK LEUMI TRUST"); defendant BANK LEUMI


EXHIBIT
B

1  (LUXEMBOURG) S.A. ("BANK LEUMI-LUXEMBOURG"); defendant LEUMI

2  PRIVATE BANK S.A. ("LPB" and formerly "BANK LEUMI-SWITZERLAND");

3  and defendant BANK LEUMI USA.

4       2.   An "undeclared account" was a financial account owned

5  by an individual subject to U.S. tax and maintained in a foreign

6  country that had not been reported by the individual account

7  owner to the U.S. government on an income tax return and a

8  Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1

9  ("FBAR").

10       3.   These introductory allegations are incorporated as if

11  re-alleged in full in Count One of this Information.

COUNT ONE

12

13  A.   THE OBJECT OF THE CONSPIRACY

14       4.   From at least in or about 2000 and continuing until at

15  least in or about early 2011, defendants BANK LEUMI-ISRAEL, BANK

16  LEUMI TRUST, BANK LEUMI-LUXEMBOURG, BANK LEUMI-SWITZERLAND, BANK

17  LEUMI USA (collectively, the "Defendants") did unlawfully,

18  voluntarily, intentionally, and knowingly conspire, combine,

19  confederate, and agree together and with others both known and

20  unknown to the United States Attorney to commit the following

21  offense against the United States:  to willfully aid, assist in,

22  procure, counsel, and advise the preparation and presentation of

23  false income tax returns and other documents to the Internal

24  Revenue Service of the Treasury Department (the "IRS"), in

25  violation of Title 26, United States Code, Section 7206(2).

26  B.   THE MANNER AND MEANS OF THE CONSPIRACY

27       5.   The object of the conspiracy was carried out, and was

28  to be carried out, in substance, as follows:

2

1          a.    Defendants BANK LEUMI-ISRAEL, BANK LEUMI TRUST,

2    BANK LEUMI-LUXEMBOURG, and BANK LEUMI-SWITZERLAND aided,

3    assisted, and advised their U.S. clients to either sell all of

4    the U.S. securities in their accounts or advised their clients

5    to set up a nominee offshore entity which was controlled by the

6    client, all in order to avoid U.S. tax reporting requirements;

7          b.    Defendants BANK LEUMI-ISRAEL and BANK LEUMI-

8    SWITZERLAND aided and assisted U.S. taxpayer-clients, who were

9    exiting an illegal U.S. cross-border business they were

10   conducting with Swiss Bank A, to open accounts at defendants

11   BANK LEUMI-ISRAEL and BANK LEUMI-SWITZERLAND, knowing that the

12   U.S. taxpayer-clients were seeking to maintain accounts that

13   were undeclared to U.S. authorities;

14         c.    Defendants BANK LEUMI-ISRAEL, BANK LEUMI-

15   LUXEMBOURG, and BANK LEUMI-SWITZERLAND used account features

16   such as "Hold Mail," "Assumed Name," "Numbered Accounts," and

17   defendant BANK LEUMI TRUST established accounts for U.S. clients

18   that listed defendant BANK LEUMI TRUST as the nominee account

19   holder, all to reduce the likelihood that their clients' U.S.

20   accounts would be disclosed to or discovered by U.S.

21   authorities; and

22         d.    Defendants BANK LEUMI-ISRAEL, BANK LEUMI-

23   LUXEMBOURG, BANK LEUMI-SWITZERLAND and BANK LEUMI USA agreed to

24   a plan whereby loans issued by defendant BANK LEUMI USA to U.S.

25   clients would be backed by the U.S. clients' undeclared offshore

26   assets held in accounts at defendants BANK LEUMI-ISRAEL, BANK

27   LEUMI-LUXEMBOURG, and BANK LEUMI-SWITZERLAND, in order to allow

28   the U.S. clients to enjoy the economic benefits of the funds in

1  their undeclared accounts without directly repatriating the
2  funds or creating a paper trail that could potentially disclose
3  the existence of the undeclared accounts to U.S. authorities.
4  C.   OVERT ACTS
5      6.   In furtherance of the conspiracy, and to accomplish
6  its object, Defendants, together with others known and unknown
7  to the United States Attorney, committed and willfully caused
8  others to commit the following overt acts, among others, in the
9  Central District of California and elsewhere:
10 **CLIENT 1**
11      a.   In or about November 2007, in Tel Aviv, Israel,
12 Client 1, a U.S. citizen residing in Malibu, California, opened
13 an undeclared account at defendant BANK LEUMI-ISRAEL in Tel
14 Aviv, Israel.
15      b.   In or about July 2008, Client 1, with assistance
16 from Banker 1, an employee of defendant BANK LEUMI-ISRAEL in Tel
17 Aviv, Israel, and Banker 2, an employee of defendant BANK LEUMI
18 USA in Los Angeles, California, opened an account at defendant
19 BANK LEUMI USA in Los Angeles, California.
20      c.   In or about November 2008, Client 1, with
21 assistance from Banker 1 and Banker 2, caused defendant BANK
22 LEUMI USA in Los Angeles, California, to extend a $7 million
23 credit facility to Client 1, collateralized by Client 1's
24 undeclared account at defendant BANK LEUMI-ISRAEL.
25      d.   On or about October 21, 2009, from the Central
26 District of California, Client 1 filed with the IRS a false and
27 fraudulent U.S. Individual Income Tax Return, Form 1040, for tax
28

4

1  year 2008 that failed to report the undeclared account at

2  defendant BANK LEUMI-ISRAEL.

3  **CLIENT 2**

4          e.    In or about 1997, Client 2, a U.S. citizen

5  residing in Beverly Hills, California, opened an undeclared

6  account at defendant BANK LEUMI-LUXEMBOURG.

7          f.    In or about 2009, Client 2 traveled to

8  Luxembourg, and met with Banker 3, an executive employed by

9  defendant BANK LEUMI-LUXEMBOURG, and Banker 4, an employee of

10  defendant BANK LEUMI-LUXEMBOURG.  At that meeting, Banker 3 and

11  Banker 4 provided Client 2 with a German cellular phone, pre-

12  programmed with the Bankers' phone numbers in Luxembourg.

13          g.    In or about 2009, Banker 3 and Banker 4

14  instructed Client 2 to never call them from Client 2's personal

15  phone, but to only call them using the German cellular phone

16  they provided to Client 2.

17          h.    Between in or about 2009 and in or about 2011,

18  from the Central District of California, and elsewhere, Client 2

19  called Banker 3 and Banker 4 using the German cellular phone

20  they had provided in order to discuss Client 2's undeclared

21  account at defendant BANK LEUMI-LUXEMBOURG.

22          i.    On or about February 17, 2011, from the Central

23  District of California, Client 2 filed with the IRS a false and

24  fraudulent U.S. Individual Income Tax Return, Form 1040, for tax

25  year 2009 that failed to report the undeclared account and

26  related income associated with the undeclared account at

27  defendant BANK LEUMI-LUXEMBOURG.

28

5

**CLIENT 3**

j.   On or about January 5, 2004, Client 3, a U.S. citizen residing in Tarzana, California, sent Banker 5, an employee of defendant BANK LEUMI-ISRAEL in Tel Aviv, Israel, a fax asking that his name be added as a beneficial owner of two undeclared accounts with in excess of $12 million on deposit at defendant BANK LEUMI-ISRAEL in Tel Aviv, Israel.

k.   On or about April 16, 2009, from the Central District of California, Client 3 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2008 that failed to report the undeclared account and related income associated with the undeclared account at defendant BANK LEUMI-ISRAEL.

l.   On or about October 2010, Banker 6, an employee of defendant BANK LEUMI USA in Beverly Hills, California, caused defendant BANK LEUMI USA in Beverly Hills, California, to renew a $6.5 million credit facility extended to Client 3, collateralized by Client 3's undeclared account at defendant BANK LEUMI-ISRAEL.

**CLIENT 4**

m.   In or about September 2008, Client 4, a U.S. citizen residing in Hollywood, Florida, flew to Switzerland to close his account at Swiss Bank A, and during that trip met with Banker 7, an employee of defendant BANK LEUMI-SWITZERLAND, in order to transfer his funds at Swiss Bank A to defendant BANK LEUMI-SWITZERLAND.

n.   In or about September 2008, Banker 7 facilitated the opening of a numbered account at defendant BANK LEUMI-

6

1  SWITZERLAND by directly communicating with one or more bankers
2  at Swiss Bank A.
3          o.   In or about September 2008, Banker 7 suggested to
4  Client 4 that Client 4 should have his mail from defendant BANK
5  LEUMI-SWITZERLAND held at the bank to help prevent Client 4's
6  account at defendant BANK LEUMI-SWITZERLAND from being disclosed
7  to the United States Government.
8          p.   In or about September 2008, Banker 7 instructed
9  Client 4 not to take any bank account opening documents from
10 defendant BANK LEUMI-SWITZERLAND when Client 4 traveled back to
11 the United States.
12
13                         STEPHANIE YONEKURA
                           Acting United States Attorney
14                         Central District of California
15
16                         _____
17                         ROBERT DUGDALE
                           Assistant United States Attorney
18                         Chief, Criminal Division
19
20                         _____
                           SANDRA R. BROWN
21                         Assistant United States Attorney
                           Chief, Tax Division
22
23
24                         CHRISTOPHER S. STRAUSS
                           ELLEN M. QUATTRUCCI
25                         DENNIS R. KIHM
                           Trial Attorneys
26                         U.S. Department of Justice
                           Tax Division
27
28

                                  7

1  **STATEMENT OF FACTS**

2

3  **ENTITIES INVOLVED IN THE OFFENSE**

4  1.    Bank Leumi le-Israel, B.M. ("Bank Leumi-Israel") is a

5  public company, registered with the Registrar of Companies in

6  Israel and traded on the Tel-Aviv stock exchange.  Bank Leumi-

7  Israel is one of Israel's largest banks with over 13,000

8  employees and subsidiaries in 7 countries.  Bank Leumi-Israel is

9  the parent company of the Leumi Group.  As of December 31, 2013,

10  the Leumi Group had approximately $313 billion in assets under

11  management.

12  2.    The Bank Leumi le-Israel Trust Company Ltd. ("Bank

13  Leumi Trust") is a subsidiary fully owned by Bank Leumi-Israel.

14  Bank Leumi Trust was founded in 1939 and is the oldest and

15  largest of all bank trust companies in Israel.  Bank Leumi Trust

16  provides comprehensive trust services including the

17  establishment of trusts for clients of Bank Leumi-Israel.

18  3.    Leumi Private Bank S.A. ("Leumi Private Bank") is a

19  subsidiary of Bank Leumi-Israel.  Leumi Private Bank was

20  established in January 2012 after Leumi purchased Banque Safdie

21  SA and merged it with Bank Leumi Switzerland Ltd.  Bank Leumi

22  Switzerland Ltd. was founded in 1953 in Zurich and also had

23  operations in Geneva (hereinafter referred to "Bank Leumi-

24  Switzerland").

25  4.    Bank Leumi (Luxembourg) S.A ("Bank Leumi-Luxembourg")

26  is a subsidiary of Bank Leumi-Israel.  Bank Leumi-Luxembourg was

27  founded in 1994 to serve as the Bank Leumi Group's marketing arm

28

1



for private banking services, for wealthy clients from all over the world.

5.    Bank Leumi USA is an FDIC-insured, full-service commercial bank that provides financial services to middle market firms and international businesses through offices in California, New York, Illinois, and Florida. Bank Leumi USA is the largest subsidiary of the Leumi Group.

6.    Bank Leumi-Israel, Bank Leumi-Switzerland, and Bank Leumi-Luxembourg (collectively "Bank Leumi") provided private banking, wealth management, and other related financial services to high-net-worth individuals and entities around the world, including citizens, resident aliens, and permanent residents of the United States ("U.S. taxpayers") located in the Central District of California, and elsewhere.  Bank Leumi engaged the services of Bank Leumi USA and Bank Leumi Trust as part of their private banking and wealth management services for high-net-worth clients.

7.    Bank Leumi-Israel, Bank Leumi USA, Bank Leumi-Switzerland, Bank Leumi Trust, and Bank Leumi-Luxembourg each acknowledge and accept responsibility for the acts and omissions of their officers, executives, managers and employees.

### U.S. INCOME TAX AND REPORTING OBLIGATIONS

8.    U.S. citizens, resident aliens, and legal permanent residents have an obligation to report all income earned from foreign bank accounts on their tax returns and to pay the taxes due on that income.  Since at least 1980, U.S. citizens, resident aliens, and legal permanent residents had an obligation

2

to report to the Internal Revenue Service ("IRS") on the Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether the individual had a financial interest in, or signature authority over, a financial account in a foreign country in a particular year by checking "Yes" or "No" in the appropriate box and identifying the country where the account was maintained.

9.   Since at least 1980, U.S. citizens, resident aliens, and legal permanent residents who had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the Department of Treasury a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 (the "FBAR").   The FBAR for the applicable year was due by June 30 of the following year.

10.   An "undeclared account" was a financial account owned by an individual subject to U.S. tax and maintained in a foreign country that had not been reported by the individual account owner to the U.S. government on an income tax return and an FBAR.

### BANK LEUMI'S U.S. CROSS-BORDER BUSINESS

11.   From at least 2000 until at least 2010, Bank Leumi-Israel, and its subsidiaries Bank Leumi USA, Bank Leumi-Switzerland, Bank Leumi Trust, and Bank Leumi-Luxembourg, through certain private bankers and managers in the United States cross-border business, in the Central District of California and elsewhere, did unlawfully, voluntarily, intentionally, and knowingly agree together with others to

3

commit the following offense against the United States: to
willfully aid and assist in the preparation and presentation of
false income tax returns and other documents to the Internal
Revenue Service of the Treasury Department, in violation of
Title 26, United States Code, Section 7206(2), all in violation
of Title 18, United States Code, Section 371.

12.   Bank Leumi knowingly opened and maintained undeclared
accounts that aided and assisted U.S. taxpayers in concealing
their offshore assets and income from U.S. taxing authorities.
Bank Leumi, through certain of its managers, private bankers and
employees, promised certain U.S. clients that their accounts
would not be disclosed to the U.S. taxing authorities.

13.   Prior to April 2009, Bank Leumi sent private bankers
to the United States on a regular basis for the purpose of
opening new accounts and servicing existing accounts of U.S.
taxpayers.   The private bankers would meet with U.S. taxpayers
in hotels, parks, and coffee shops because they were not allowed
to meet clients in the domestic branches of Bank Leumi USA to
discuss the clients' accounts and sign bank documents.   These
private bankers traveled to the United States, most frequently
Los Angeles, California, New York, New York and Miami, Florida,
one to four times per year, to meet with several clients a day,
for a week or two-week period.

14.   Certain private bankers would bring bank statements to
the United States for review by the U.S. taxpayers, including
those with "Hold Mail" service.   After the records were
reviewed, certain private bankers or the U.S. taxpayer would
dispose of the bank statements to conceal the beneficial owner

4

of the undeclared account and reduce the risk of disclosure to U.S. taxing authorities.

15. The U.S. travel was approved by relevant executives and paid for by Bank Leumi. The Bank Leumi executives knew that the purpose of the U.S. travel was to recruit and/or service U.S. taxpayer accounts. In fact, upon return to Israel, Switzerland, or Luxembourg, the private bankers produced reports that summarized the new business generated from the accounts for their management.

16. When private bankers traveled to the United States, they were required to complete certain forms upon entry to the United States, including Customs Declaration Form 6059B. On Form 6059B, certain private bankers would falsely claim, under the penalties of perjury, that the primary purpose of their trip to the United States was not business. Bank Leumi managers were aware of the false declarations and took no corrective action until April 2009.

17. In many instances, Bank Leumi private bankers knew that the accounts of the U.S. taxpayers they visited were not disclosed to the U.S. taxing authorities. They also knew that certain U.S. taxpayers they visited were evading their U.S. tax obligations.

18. Bank Leumi-Israel, Bank Leumi-Switzerland, and Bank Leumi Luxembourg, knew that certain U.S. taxpayers were maintaining undeclared accounts and offered an array of services and products that aided and assisted the U.S. taxpayers with opening and maintaining undeclared accounts. These products and services included: (1) the issuance of guarantees and Standby

5

Letters of Credit to collateralize loans issued by Bank Leumi USA; (2) use of offshore entities and the Bank Leumi Trust to serve as nominee accountholders; (3) use of hold mail, assumed name accounts, and numbered accounts; and (4) opening and maintaining accounts for U.S. taxpayers that exited UBS and other Swiss banks after the Department of Justice's investigation of UBS became public.

19.   Bank Leumi, Bank Leumi USA and Bank Leumi Trust each knew that the products and services each provided would result in false U.S. Individual Income Tax Returns and other false documents being filed with the Internal Revenue Service.

## MARKETING OF LOANS TO U.S. TAXPAYERS
## WHO HELD UNDECLARED ACCOUNTS

20.   Bank Leumi USA, Bank Leumi-Israel, Bank Leumi-Switzerland, Bank Leumi Trust, and Bank Leumi-Luxembourg, through managers and private bankers, agreed to offer, market and service two types of loans that assisted U.S. taxpayers with concealing their assets and evading their U.S. tax obligations: (1) participation loans; and (2) Standby Letter of Credit Loans ("SBLC Loans").

21.   A "participation loan" was a loan originated by Bank Leumi USA wherein the foreign bank -- Bank Leumi-Israel, Bank Leumi-Switzerland, or Bank Leumi-Luxembourg -- purchased 100% funded participation in the loan and the U.S. client executed a set-off letter securing all debts and obligations in favor of the foreign bank.  Bank Leumi USA and the foreign entity split equally (50/50) the spread (the difference between the interest

1   rate of the loan and the interest rate on the time deposit at
2   the foreign entity).

3       22.   An SBLC Loan, also known as a "back-to-back loan," was
4   a loan issued by Bank Leumi USA that was secured or
5   collateralized by funds at Bank Leumi-Israel, Bank Leumi-
6   Switzerland or Bank Leumi-Luxembourg.   Bank Leumi USA received
7   interest payments on the loan and the foreign entity separately
8   collected a "guaranty fee" or "commission" for the issuance of
9   the SBLC which together usually amounted to 1% of the loan
10  amount.

11      23.   From 2002 to 2010, Bank Leumi USA issued SBLC Loans
12  secured by accounts of 205 U.S. taxpayers.   Bank Leumi profits
13  related to these SBLC Loans totaled approximately $23 million
14  from 2002 to 2010.

15      24.   Typically, the U.S. borrower would be required to make
16  interest-only payments and could renew the participation or SBLC
17  Loans annually.   Indeed, some loans were issued in the 1990's
18  and renewed annually for a twenty-year period.

19      25.   Private bankers and managers at Bank Leumi USA and
20  Bank Leumi were aware that the SBLC Loans allowed the U.S.
21  taxpayers to enjoy the economic benefits of the funds in the
22  undeclared accounts without directly repatriating the funds or
23  creating a paper trail that could potentially disclose the
24  existence of the undeclared accounts to U.S. authorities.

25      26.   Indeed, when certain U.S. taxpayers wanted to withdraw
26  funds from an undeclared account or close the undeclared
27  account, Bank Leumi private bankers would offer them the
28  alternative of taking out a participation or SBLC Loan in order

to keep the funds on deposit.  Similarly, Bank Leumi USA bankers would suggest a participation or SBLC Loan to certain U.S. taxpayers when the clients wanted to maintain their undeclared account but retain full use and enjoyment of the funds.

27.  In and around 2000, Bank Leumi USA began an initiative to convert all participation loans to SBLC Loans.  One reason for the conversion from participation to SBLC Loans was to remove information in Bank Leumi USA files that would disclose the existence and identity of U.S. taxpayers who maintained undeclared accounts at Bank Leumi.  Beginning in and around 2000, Bank Leumi USA, through certain executives, began structuring its files so that the bank's records contained no reference to or identifying information about the U.S. taxpayers' undeclared accounts.

28.  In 2000, a Bank Leumi USA executive in Beverly Hills, California sent a communication to a Bank Leumi USA executive in New York indicating that he considered SBLC Loans cleaner than participation loans.  The SBLC Loan was "cleaner," in his view, because it did not require Bank Leumi USA and the foreign affiliate to correspond regarding the profits generated from the loan or to transfer money to the foreign affiliate to compensate it for participating in the loan.  The information that Bank Leumi USA did not want to have in its files included:  (i) the name of the account holder of the foreign account; (ii) the account number; and (iii) the foreign branch where the account was located.

29.  In and around 2000, the same Bank Leumi USA executive advised a manager at Bank Leumi-Israel that he "cleaned" his

8

files of information concerning undeclared accounts for the specific purpose of concealing the U.S. taxpayers' undeclared accounts and reducing the likelihood that that U.S. authorities would claim that Bank Leumi USA assisted clients with hiding assets.

30.   In an effort to conceal the existence of undeclared accounts and reduce the risk that beneficial owners of undeclared accounts would be identified, beginning in and around 2000, Bank Leumi USA would not identify the person who applied for the SBLC, usually the U.S. taxpayer with the undeclared account, on any of the loan paperwork that remained in the United States.   Specifically, the SWIFT message that recorded the SBLC would generically refer to the SBLC applicant as "you" or "the applicant."   It was not until January 2011, after an internal review of SBLC Loans, that Bank Leumi USA changed this policy and required all SWIFT messages to include the name of the SBLC applicant in the SWIFT message.

31.   In connection with their applications for participation or SBLC Loans, U.S. taxpayers would submit personal financial statements that did not disclose the existence of their foreign accounts.   Likewise, when Bank Leumi USA private bankers prepared memoranda for review by Bank Leumi USA's credit committee, the existence of the foreign account was not documented.   Instead, the credit documentation would reference the U.S. taxpayer being a well-known customer to the Leumi Group and that the loan was guaranteed by an SBLC issued by a foreign affiliate.

32.  On occasion, Bank Leumi USA private bankers would receive and review the U.S. Individual Income Tax Returns of the U.S. taxpayer as part of the loan application process. Oftentimes, the tax returns in Bank Leumi USA's possession did not disclose the existence of the foreign account or report the income generated by the foreign account.

33.  On August, 27, 2008, the Federal Deposit Insurance Company ("FDIC") and the California Department of Financial Institutions ("CDFI") issued a Cease and Desist Order concerning Mizrahi Tefahot Bank Ltd. in Los Angeles, California ("Mizrahi Bank").  The FDIC and CDFI ordered Mizrahi Bank not to make or renew any "back-to-back" loans or any other similar extensions of credit unless Mizrahi Bank reviewed and maintained copies of all records concerning the collateral, including, but not limited to, records documenting the owner of the foreign account.  Bank Leumi understood that the FDIC and CDFI found that Mizrahi Bank's practices with respect to the back-to-back loans did not satisfy Mizrahi Bank's Know Your Customer obligations and violated certain Bank Secrecy Act and anti-money laundering regulations.

34.  From at least 2000 through January 2011, Bank Leumi USA issued back-to-back loans to customers who had accounts at Bank Leumi-Israel -- in their own names or in the name of Bank Leumi Trust -- or at Bank Leumi-Switzerland or Bank Leumi-Luxembourg without reviewing or maintaining records concerning the collateral pledged by the U.S. taxpayer.

35.  On October 3, 2008, a copy of the Mizrahi Bank Cease and Desist Order was circulated to, among others, executives at

Bank Leumi USA.  Five days later, in response to the cease and desist order, on October 8, 2008, Bank Leumi USA notified Bank Leumi-Luxembourg that "effective immediately," any SBLC guaranty issued by Bank Leumi-Luxembourg must include the applicant's full name and address.

36.  A Bank Leumi-Luxembourg advisor argued against the policy change stating that "[c]ustomers do not want their names to appear on official documents, such as an SBLC" and the change "will have a major impact on our business."

37.  One reason the policy change was resisted by Bank Leumi-Luxembourg, with the knowledge of Bank Leumi-Israel executives, was because certain U.S. taxpayers were not disclosing their accounts to U.S. taxing authorities and would not want the fact that they had a foreign bank account disclosed in the records of Bank Leumi USA.

38.  After "extensive internal discussion," on January 5, 2009, a Bank Leumi USA executive advised a Bank Leumi-Israel executive that the policy change would be rescinded, but that Bank Leumi must confirm that "all KYC information is current and on file" with the foreign affiliate and that "the client is in good standing" with the foreign affiliate.

39.  Bank Leumi USA, through its executives and managers, continued issuing and renewing back-to-back loans without reviewing or maintaining records concerning the pledged collateral.  The practice continued until January 20, 2011, when, after an internal review of SBLC Loans, Bank Leumi USA amended its policy to require that any SBLC guaranty include the applicant's name.

40.    Beginning in early 2011, before Bank Leumi was notified of the investigation, Bank Leumi USA began its own assessment of SBLC Loans by reviewing all customer relationships with outstanding SBLC Loans to confirm whether the U.S. taxpayers were tax compliant or not.

## OFFSHORE ENTITIES AND QI AGREEMENT

41.    Effective January 1, 2001, Bank Leumi-Israel, Bank Leumi-Switzerland, and Bank Leumi-Luxembourg each entered into a Qualified Intermediary Agreement ("QI Agreement") with the IRS. QI Agreements provide a comprehensive framework for U.S. information reporting and tax withholding for both non-U.S and U.S. persons, based upon applicable U.S. withholding and reporting rules.  The QI Agreement is designed to ensure that U.S. persons are properly paying U.S. tax with respect to U.S. securities held in an account.

42.    In and around late 2000, certain private bankers advised U.S. clients that held U.S. securities in their accounts that the accounts could remain undeclared (i) if they sold all U.S. securities prior to January 1, 2001 and signed a waiver form agreeing that they did not want U.S. securities purchased in the future; or (ii) set up an offshore corporation that would serve as the nominee account holder so that Bank Leumi would not have to report ownership by a U.S. person.

43.    Private bankers and managers sometimes referred U.S. taxpayers to outside lawyers and consultants to set up the offshore corporations in jurisdictions like the British Virgin Islands, Panama, Belize and elsewhere.  The use of offshore

12

corporations allowed U.S. clients to hold and transact in U.S. securities without disclosing the identity of the true beneficial owner or triggering withholding on certain accounts.

44. Private bankers and managers accepted and included in Bank Leumi's account records IRS Forms W-8BEN (or substitute forms) provided by the directors of the offshore companies which represented under penalties of perjury that such companies were the beneficial owners, for U.S. federal income tax purposes, of the assets in the accounts. In certain cases, the IRS Forms W-8BEN (or substitute forms) were false or misleading in that the U.S. taxpayer who owned the offshore company actually directed and controlled the management and disposition of assets in the company accounts and/or otherwise functioned as the beneficial owner of such assets in disregard of the formalities of the purported corporate ownership.

45. Alternatively, in order to avoid disclosure to the U.S. taxing authorities, private bankers would advise certain U.S. taxpayers not to purchase U.S. securities, thereby avoiding QI requirements altogether.

46. Similarly, Bank Leumi-Israel private bankers would suggest that U.S. taxpayers open an account through Bank Leumi Trust in order to add "an extra level of secrecy" to the account. The undeclared account would be opened at Bank Leumi-Israel in the name of Bank Leumi Trust. All bank statements and correspondence would refer to Bank Leumi Trust as the owner of the account. Bank Leumi Trust would maintain records detailing the beneficial owner of the account.

47.   As late as 2010, after Bank Leumi-Israel began closing accounts that were opened in the name of offshore corporations, it allowed certain high-net-worth clients, with the approval of executives, to open accounts at Bank Leumi Trust.

### USE OF ACCOUNT FEATURES TO CONCEAL ACCOUNTS: HOLD MAIL/ASSUMED NAME/NUMBERED ACCOUNTS

48.   Bank Leumi recommended U.S. taxpayers utilize certain account features that would reduce the risk of U.S. taxing authorities learning the identities of U.S. taxpayers who maintained undeclared accounts.

49.   One such feature was "Hold Mail" service.  U.S. taxpayers who opted for the "Hold Mail" service ensured that every statement of account, notice or other document associated with the account would not be sent to the customer's address in the United States.  The customer's mail would remain at the branch.

50.   During 2002 to 2010, Bank Leumi maintained approximately 2450 U.S. accounts in the global private banking division with "Hold Mail" service.  During this period, Bank Leumi charged a total of approximately $1.5 million to U.S. taxpayers for holding their mail outside the United States at the foreign entities.

51.   Bank Leumi also provided certain U.S. taxpayers with "assumed name" and "numbered" accounts.  While the foreign affiliate kept records of the true identity of the client pursuant to Know Your Customer obligations, if a U.S. taxpayer selected either an "assumed name" or "numbered" account, the

name of the account holder would not appear on any correspondence, account statements, communications or notices. Until in and around 2004, Bank Leumi allowed U.S. taxpayers to complete wire transfers using assumed names or numbered accounts without disclosing the U.S. taxpayer's true identity or true account number. In or before 2008, Bank Leumi-Israel stopped offering new "assumed name" accounts and began converting existing "assumed name" accounts into regular accounts.

### EFFORTS TO OBTAIN U.S. CUSTOMERS FORCED TO EXIT UBS AND OTHER SWISS BANKS

52. In early May 2008, the fact that UBS was being investigated by the Department of Justice became public. UBS disclosed that the corporation was being investigated for, among other things, assisting U.S. taxpayers with evading their taxes.

53. On May 7, 2008, a newspaper article regarding the UBS investigation was distributed to high-level executives within Bank Leumi.

54. In July 2008, UBS, the largest Swiss bank, announced that it was closing its U.S. cross-border banking business.

55. Certain Bank Leumi executives in both Israel and Switzerland viewed UBS's exit from the U.S. cross-border business as an opportunity and sought to obtain former UBS customers whose accounts UBS had stopped servicing because the accounts were undeclared and were used to evade U.S. tax obligations.

56. In September 2008, a Bank Leumi manager sent an e-mail to private bankers (including private bankers who dealt

exclusively with U.S. customers) noting that "[a]s was published in the press and media, UBS is under investigation of US authorities for AML issues.  Many customers who maintain their accounts in the 'UBS' Bank or in other banks in Europe feel pressured from such publications" and "want to transfer their accounts to other banks."

57.  In the same e-mail, the manager acknowledged that "many banks in Europe . . . are refusing to open an account for these customers."  Nonetheless, the manager described the UBS exodus as a "golden opportunity to contact customers who you know have accounts in banks in Europe" and urged the private bankers to "suggest that [the customers] transfer their accounts" to Bank Leumi-Israel for "understood" reasons.

58.  In a July 2009 strategy meeting, another manager referred to the UBS exodus as a "tremendous opportunity" to be exploited.  At the same meeting, an executive cautioned that "[e]verything needs to be in the appropriate dosage – And we do not want the Americans to understand that the safe haven for the money from Switzerland is Israel.  Everything needs to be done judiciously and in accordance with legal guidelines – on a case by case basis."  After this strategy meeting, the executive continued to approve account openings for high-net-worth U.S. clients on a case-by-case basis.

59.  In late 2008, Bank Leumi-Switzerland was introduced to a Swiss Asset Manager by an executive at Bank Leumi-Israel.  The Swiss Asset Manager sought to refer a substantial number of high-net-worth clients that had undeclared accounts at Swiss banks to Bank Leumi-Switzerland.  Certain Bank Leumi-Switzerland

executives discussed and decided to open accounts for these U.S. taxpayers.

60.  From late 2008 through 2010, the Swiss Asset Manager referred a total of 66 former Swiss bank account holders to Bank Leumi-Switzerland.  Bank Leumi-Switzerland knew that the U.S. taxpayers sought to maintain undeclared accounts.  Pursuant to a referral contract, Bank Leumi-Switzerland compensated the Swiss Asset Manager for the referrals. Bank Leumi-Israel executives were aware of the referrals.

61.  In the UBS aftermath, Bank Leumi-Israel accepted transfers from UBS and other Swiss banks for 104 U.S. clients, increasing assets under management by approximately $135 million.  Bank Leumi-Switzerland accepted transfers and opened accounts for 155 customers, increasing assets under management by approximately $263 million.  Bank Leumi-Luxembourg accepted transfers and opened accounts for 4 customers, increasing assets under management by approximately $3 million.

**BANK LEUMI'S INADEQUATE COMPLIANCE SYSTEMS**

62.  Prior to the UBS investigation, Bank Leumi did not develop and implement an effective system of supervisory and compliance controls over private bankers with respect to tax compliance to prevent and detect violations of U.S. tax laws, including issuing specific policies regarding the proper handling of accounts beneficially owned by U.S. persons.

63.  Bank Leumi did not effectively monitor and control the activities of certain private bankers and managers in the U.S. cross-border business, and, as a result, some private bankers

and their managers adopted the position that compliance with U.S. tax law was exclusively the concern of the U.S. taxpayers.

64. Bank Leumi, even after the UBS tax investigation became public, did not adopt a compliance program to fully address the bank's obligations with respect to U.S. tax law compliance. Bank Leumi did not issue policies, directives or guidance prohibiting private bankers from assisting U.S. taxpayers with evading their tax obligations.

65. Bank Leumi took inadequate steps to educate their private bankers about the proper handling of U.S taxpayers and what conduct would constitute actively assisting U.S. taxpayers with concealing assets and evading U.S. tax obligations. Bank Leumi focused primarily on compliance with banking regulations and SEC rules, but did not implement policies or directives that were adequate to detect or prevent violations of U.S. tax law.

66. For example, on June 4, 2009 – almost a year after the UBS tax investigation became public – a Bank Leumi-Israel executive distributed new guidelines concerning American customers to private bankers. These guidelines did not fully address or remedy Bank Leumi's compliance with U.S. tax laws.

67. The guidelines stated: "Effective immediately, we have decided not to accept any new accounts involving use of an offshore private investment company [or similar structure], where the sole or principal beneficial owner is a US resident, and regardless of whether the account-holder or beneficial owner has furnished a W-9 or whether the account includes U.S. securities."

68.   This limited guidance was not fully implemented and in certain instances exceptions to the guidance were made in favor of maintaining and accepting new U.S. cross-border business.

69.   Although a significant number of U.S. customers left Bank Leumi as a result of its remedial efforts, private bankers and managers continued to open and service accounts of U.S. taxpayers they knew to be evading U.S. tax obligations.  As late as 2010, Bank Leumi private bankers continued to advise U.S. taxpayers that, unlike UBS, Bank Leumi would not disclose names to U.S. authorities and, therefore, there was no need to close the undeclared account.  Even after the IRS's Offshore Voluntary Disclosure Program was announced, Bank Leumi-Israel was advising certain U.S. taxpayers to buy property in Israel with the funds in the undeclared accounts or transfer the funds into the name of an Israeli relative in order to avoid disclosure to certain U.S. taxing authorities.  Bank Leumi did not timely develop compliance measures to identify, detect or prevent this conduct.

**THIRD PARTY REFERRALS OF U.S. CUSTOMERS TO BANK LEUMI LUXEMBOURG**

70.   In and around 2002, a Bank Leumi USA executive in Beverly Hills, California introduced Bank Leumi-Luxembourg executives to a U.S. tax return preparer, David Kalai.  David Kalai, the principal owner of United Revenue Service, Inc. ("URS"), sought the assistance of Bank Leumi-Luxembourg to open undeclared accounts for his tax preparation clients.

71.   Bank Leumi-Luxembourg, through its executives, negotiated a draft referral agreement with David Kalai for the

purpose of providing compensation to him for referring U.S. taxpayers to Bank Leumi-Luxembourg to open accounts.

72.  David Kalai and his son Nadav Kalai were both referral agents of Bank Leumi-Luxembourg.

73.  David Kalai, Nadav Kalai, and others employed at URS arranged for a Bank Leumi-Luxembourg private banker to meet U.S. taxpayers in California, and elsewhere, to open their undeclared accounts.  During the account opening process, the private banker advised U.S. taxpayers that the accounts would not be disclosed to the U.S. taxing authorities.

74.  Other times, David Kalai would arrange for the U.S. taxpayer to complete the account opening forms to open the account at Bank Leumi-Luxembourg at the Beverly Hills Branch of Bank Leumi USA.

75.  David Kalai, and others at URS, referred at least 23 customers to Bank Leumi-Luxembourg.